# UNITED STATES DISTRICT COURT
for the
Northern District of Texas

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
        I-Phone Model A1778 )
   )
   )

Case No. 2:19-MJ-148

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
JUL 17 2019
CLERK, U.S. DISTRICT COURT
By _____ Deputy

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the    NORTHERN    District of    TEXAS   , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, USC, Section 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

The application is based on these facts:

SEE AFFIDAVIT

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ (signature)*
*Applicant's signature*

Chris Walters, DEA TFO
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7-17-19

*/s/ Lee Ann Reno*
*Judge's signature*

City and state: AMARILLO, TEXAS

Lee Ann Reno, U.S MAGISTRATE JUDGE
*Printed name and title*

## Attachment A

## Property to Be Searched

I-Phone Model A1778 FCC ID: BCG-E3091A (DEA Exhibit N-2) seized from Seferino Camacho SOTO pursuant to his arrest on July 3, 2019.

## ATTACHMENT "B"
## LIST OF ITEMS TO BE SEARCH FOR AND SEIZED

### Property to be Searched and Seized

All electronic records relating to violations of Possession with Intent to Distribute a Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), including:

>   Text messages;
>   E-mail messages;
>   Voice mail messages;
>   Internet browsing history;
>   Historical location (GPS) data;
>   Photos;
>   Video;
>   Audio files;
>   Calendars;
>   Word processing documents;
>   Spreadsheets;
>   Text files;
>   Contact names and telephone numbers;
>   Incoming and outgoing call logs; and
>   Forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when it was used.

# AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANT
## 2:19-MJ-148

I, Chris Walters, a Task Force Officer with the Drug Enforcement Administration, do depose and say:

### Affiant's Qualifications

1. I have been a Task Force Officer (TFO) with Drug Enforcement Administration (DEA) since January 2012. I have received basic training from the DEA, Texas Department of Public Safety (DPS), the Midwest Counter Drug Training Center, the Texas Narcotics Officers Association, and several other organizations. I am currently assigned as a TFO with the DEA's Amarillo High Intensity Drug Trafficking Areas (HIDTA) group. My duties include, but are not limited to, investigating drug trafficking organizations responsible for the smuggling, distribution, and transportation of quantities of illegal controlled substances into and across the United States. I have been involved in previous investigations in which drug trafficking organizations purchase assets and operate front companies in an attempt to launder drug proceeds and conceal the true source of their illegal income. In each of these investigations, the members of the organizations have utilized telephones in order to communicate and orchestrate their distribution operations. Concurrent with my assignment to the Amarillo DEA Task Force, I am employed as a Deputy with the Potter County Sheriff's Office and have been so employed for the past 21 years. For the previous seven years at the Sheriff's Department, I had been assigned to the Special Operations Division, where my primary duties were to conduct narcotics and organized crime investigations. I have personally

initiated and conducted numerous narcotics investigations, including multiple-defendant organized crime cases.

This affidavit is intended to show only that there is probable cause for the requested warrant and does not set forth all of my knowledge about the matters related to the warrant.

## Source of Affiant's Information

2. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

   A. my experience investigating the distribution of illegal controlled substances and the laundering and transportation of drug proceeds;

   B. oral and written reports, and documents about this investigation that I have received from members of the DEA and the Texas Department of Public Safety (TX DPS);

   C. discussions I have had personally concerning this investigation with federal and state investigators who are experienced in investigating criminal organizations involved in drug trafficking;

## Purpose of this Affidavit

3. The information contained in this Affidavit is submitted for the sole purpose of supplying probable cause for the issuance of a search warrant for the subject electronic communications device. As shown in the following paragraphs, this device is being used in furtherance of narcotics trafficking. There is probable cause to believe that evidence

and instrumentalities of the offenses described herein continue to be located in the subject electronic communications device. The warrant is also being sought to discover evidence pertaining to: (1) possession with intent to distribute a controlled substance namely methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1).

### Device to be Searched

4. I declare that the facts contained in this Affidavit show that there is probable cause to search the following electronic communications device:

   a. There is in Potter County, Texas, a suspected electronic communications device (hereinafter referred to as "suspected device") and more specifically described as an I-Phone Model A1778 FCC ID: BCG-E3091A cell phone (DEA Exhibit N-2) seized at the Oldham County Sheriff's Office during the arrest of Seferino Camacho SOTO. The suspected device is currently secured at the Amarillo HIDTA office located at 205 Southeast 5th Avenue, Amarillo, Texas.

   b. The suspected device is owned or was in the possession of Seferino Camacho SOTO on July 3, 2019.

   c. The suspected device which contains the data and information sought is currently in the care, custody, control and management of the members of the Amarillo HIDTA Task Force.

**Electronic Storage and Forensic Analysis**

5. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books or contacts;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; recording and maintaining important notes and records; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

6. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

7. There is probable cause to believe that things that were once stored on the devices may still be stored there, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that files or remnants of such files can be recovered from electronic devices months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on an electronic device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, an electronic device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, storage media on these electronic devices contain electronic evidence of how a device has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Users of electronic devices typically

do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

   d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

8. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the electronic devices were used, the purpose of its use, who used it, and when it was used. There is probable cause to believe that this forensic electronic evidence might be on the electronic device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times

the device was in use. System files can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on an electronic device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

**Facts in Support of Probable Cause**

Affiant does believe that searching the device identified in this affidavit is likely to produce evidence that the offenses described herein has been, is, or will be committed and that the person or persons and/or the suspected party has committed, is committing, or will commit the offenses.

9.    On July 3, 2019, Texas Department of Public Safety Trooper Max Honesto was in a marked unit working routine patrol on I-40 in Oldham County, Texas. At approximately 7:17p.m., Trooper Honesto stopped a 2012 Hyundai Sonata for speeding at approximately MM 40. Upon making contact with the driver of the vehicle, who was later identified as Armando Alex MARTINEZ. Trooper Honesto noticed indicators of possible criminal activity. The passenger was identified as Seferino Comacho SOTO. Trooper Honesto noticed signs of nervousness and inconsistencies in their stories. Trooper Honesto asked for the documents to the vehicle. Trooper Honesto described the Passenger Seferino SOTO, as leaned back in his seat, appearing to be scared, and appeared to have the deer in the headlight look. SOTO was hesitant to open the glove box to retrieve the paperwork. SOTO said the vehicle belonged to his girlfriend, Brenda LOPEZ, but later told Trooper Honesto that Brenda was not his girlfriend, but just a friend. SOTO later admitted to having several children with Brenda. SOTO told Trooper Honesto that Brenda was traveling behind them in a white Tahoe with the rest of the family. MARTINEZ told Trooper Honesto he was going to visit a friend in Dallas, Texas he met on Facebook. MARTINEZ said he did not know the friends name but was going to call the friend when he arrived in Dallas. MARTINEZ did not know where they were

going to stay in Dallas, whether it was with the friend or at a motel. Trooper Honesto did speak to SOTO about the details of the trip including the purpose and the destination. SOTO said they were traveling from Phoenix Arizona to Dallas Texas to watch fireworks, and then planned to drive back to Arizona the next morning. SOTO said his girlfriend did not go because the courts would not let her. SOTO said he had family and friends in Dallas, but could not give a full name or address for them.

10. Trooper Honesto did later ask SOTO for consent to search the vehicle, which he granted. While searching the vehicle Trooper Honesto located 7 bundles wrapped in saran wrap in several locations in the vehicle. There were two locations in the interior of the vehicle containing bundles, one in the console between the driver and passenger seat up close to the firewall, and on the passenger side by the glove box. This space was accessed by opening the passenger door and removing a cover that sits flush against the door when it is closed. The bundles fit in a space behind the glove box. There were several bundles located in the trunk behind the carpeting on each rear quarter panel. Trooper Honesto also located several air fresheners in the passenger compartment, and numerous dryer sheets throughout the trunk of the vehicle. These items are commonly used by drug couriers to attempt to mask the odor of narcotics and disrupt the use of a narcotics detection canine. One of the bundles was field tested, and did give a positive indicator for the presence of methamphetamine, with a total gross weight of 7.20 pounds. This quantity of narcotics is consistent with distribution, as opposed to someone's personal use. The suspects and the vehicle were transported to the Oldham County Sheriff's Office.

11. DEA Task Force Officer Chris Walters and TX DPS S/A Malcom White did respond to the Oldham County Sheriff's Office. Both suspects were waiting in the lobby area with Trooper Honesto and Trooper Pacheco. Trooper Honesto located three cell phones in the vehicle. MARTINEZ identified the Galaxy S-10 cell phone as being his, and SOTO identified the I-Phone as being his daughters and claimed the LG cell phone as being his, but stated it was not working. Both Subjects were interviewed separately, with MARTINEZ being interviewed first. S/A White did read MARTINEZ his Miranda warnings. MARTINEZ was very slow at answering questions about the trip, and appeared to be nervous. MARTINEZ said he knew that SOTO had already blamed him. MARTINEZ said he went to SOTO's house in Chandler, Arizona last night, July 2, 2019 at approximately 7 or 8 pm. MARTINEZ said SOTO picked him up and that's when they began driving to Dallas, Texas. MARTINEZ said he did not want to say anything that would be against him and asked for an attorney. The interview was then terminated. TFO Walters asked MARTINEZ for consent to search his cell phone, and MARTINEZ did give consent. MARTINEZ used his fingerprint to unlock the cell phone, and then gave the passcode to TFO Walters to access his cell phone. In MARTINEZ's Galaxy S-10 cell phone TFO Walters located recent text messages from July 2, 2019. The messages were short and from numbers that were not saved in his phone books contacts. One of the messages from 10:03 p.m. MARTINEZ sent a text message to 602-483-9033 "Hey man chops gave me your phone number" and then a second message "!!". There was no response from that number via text message. This phone number does appear in his recent calls section of MARTINEZ cell phone. There were numerous calls

in the recent calls section of MARTINEZ cell phone that were not saved as contacts. It is common for drug couriers to use short coded text messages to coordinate the transportation of the narcotics. It is also common for drug couriers to not add numbers to their contacts for various reasons, often because drug couriers routinely change their numbers, and they do not know the other person's identity. TFO Walters did also briefly look through the photographs in MARTINEZ's cell phone. In his timeline there was a trip to Bellevue from March 3-7, 2019. One of the photographs was a bundle of U S Currency bundled together in smaller increments, then rubber banded together as a whole. There was a short video clip depicting two males in a vehicle and MARTINEZ tosses the money in his hand while speaking in Spanish saying something similar to they are there picking up that money.

12. While Agents interviewed MARTINEZ, SOTO remained in the lobby area with Troopers Honesto and Pacheco. It was later learned that during the interview SOTO told Troopers Honesto and Pacheco "don't let the kid fool you, he knows more than he will tell you".

13. TFO Walters and S/A White then interviewed SOTO. SOTO advised that he understood some English. TFO Walters askes SOTO if he was able to read in Spanish, and SOTO said he could. TFO Walters provided SOTO a rights form written in Spanish. SOTO did read the rights form out loud and then stated he understood his rights. SOTO did sign the rights form. SOTO gave Agents the same story he gave Trooper HONESTO on the road side. SOTO said they were going to drive 2 days to Dallas, Texas and watch the fireworks that night, then drive two more days to return to Arizona. SOTO was asked

if his fingerprints might be on the drugs, and SOTO responded he didn't think so. SOTO was asked how the drugs might have gotten into his girlfriend's car. SOTO said MARTINEZ borrowed the car for about 10 or 12 minutes, and believed he must have put the drugs in the car at that time. SOTO did initially give consent to search his daughters white I-Phone. SOTO provided the Pin Code to open the phone. While TFO Walters was looking through the phone SOTO began questioning if TFO Walters could search the phone because it was his daughters. SOTO then withdrew consent for TFO Walters to search the cell phone. SOTO said the LG cell phone was his, but denied consent to search the cellular phone. SOTO said the phone did not have service.

14.     Later that week, July 5, 2019 TFO Walters received a telephone call at the Amarillo DEA Office from a female identifying herself as Brenda M LOPEZ. LOPEZ said she was contacted by someone in jail and they told her we had their vehicle. TFO Walters asked if it was her boyfriend Seferino SOTO that contacted her. LOPEZ said yes, but said they were separated from each other and have been for approximately 3 years. LOPEZ said she knew SOTO had been stopped and had gone to jail in a county jail because she was tracking him using her daughter's cell phone. It is common for drug couriers to be tracked using various apps on the phone to keep track of their load of narcotics. LOPEZ said she did allow SOTO to borrow the car, but denied knowing anything about drugs being in her vehicle. LOPEZ then asked who was in the vehicle with SOTO because he did not have a driver's license so someone else must have been driving.

15. TFO Walters spoke to Trooper Honesto after the interviews. Trooper Honesto said while we were interviewing SOTO, Martinez started talking to him. MARTINEZ said after Trooper Honesto found the drugs SOTO told him to take the whole blame, and SOTO would get him an attorney, and that SOTO would get him out.

16. The Affiant took possession of the suspected device and then transported it to Amarillo, Texas as evidence. Affiant believes the suspected device will contain information about SOTO's travels while transporting the methamphetamine. Affiant also believes the suspected device will have communications with MARTINEZ and LOPEZ to coordinate their assistance in transporting the methamphetamine.

17. The Affiant from being involved with countless investigation involving the smuggling and transportation of controlled substances into and across the United States knows it is the common practice for couriers to utilize a cell phone to maintain contact with the owner of the controlled substance for whom the couriers is working for. The owners of the controlled substance are placing the courier in possession of large amounts of a controlled substance with a whole sale value often times in the hundreds of thousands of dollars and a street level value often times in the millions of dollars. The owner of the controlled substance directing the courier will most often not be the true owner of the narcotics and will most certainly have someone to answer to above them. The Affiant knows from training and experience that the owner of the controlled substance is risking heavy consequences including physical injury or death to them or even their family if the controlled substance becomes missing. The Affiant when searching cellular phones in possession of narcotics couriers in the past has found on

nearly each and every occasion the narcotics couriers' cellular device contained evidence of their narcotics trafficking activity. This evidence included but wasn't limited to photographs, videos, text messages, emails, location data, call logs and contacts. The information unveiled the courier's illegal activities and other co-conspirators that were involved with the trafficking of the controlled substances. The Affiant from training and experience has found the courier of the controlled substance normally needs to check in with the person whom is directing them at least once a day if not several times a day. The Affiant knows in some cases the person directing the courier will even track the courier utilizing the cellphone. In the investigations where the Affiant has found the courier doesn't need to check frequently is where the courier has made countless deliveries for the drug trafficking organization and is well trusted. In these cases the courier at a minimum still had the contacts and in their cellular device for the person directing them to deliver the narcotics for and or the person they were delivery the narcotics too.

## Conclusion

Your Affiant submits that based upon the above facts, there is probable cause to believe that Seferino Camacho SOTO has committed the offenses of Possession with Intent to Distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1). I further believe that there is probable cause to believe that evidence, contraband, fruits of crime, items illegally possessed, and property designed for use, intended for use, and used in committing this crime (as itemized in Attachment B to the Application for Search Warrant) will be found in the I-Phone Model A1778 FCC ID:

BCG-E3091A cell phone (DEA Exhibit N-2).   Accordingly, I respectfully ask for a warrant to search the premises under Rule 41 of the Federal Rules of Criminal Procedure.

_____
Chris Walters
Task Force Officer
Drug Enforcement Administration

SUBSCRIBED AND SWORN TO BEFORE ME on this 17th day of July, 2019.

_____
Lee Ann Reno
UNITED STATES MAGISTRATE JUDGE

_____
Joshua Frausto
Assistant United States Attorney